**Harry BOUT, Plaintiff,**

v.

**Dan L. BOLDEN, John Marshall, Everett Sandell, and Jason Allen Davies, Defendants.**

**No. 96–CV–10071–BC.**

United States District Court,
E.D. Michigan,
Northern Division.

Oct. 5, 1998.

Hugh M. Davis, Jr., Martin Adamian, Constitutional Litigation Associates, P.C., Detroit, MI, for Plaintiff.

Deborah Garcia–Luna, Assistant Attorney General, Corrections Division, Lansing, MI, for Defendants.

### ORDER SANCTIONING PLAINTIFF UNDER RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDURE

CLELAND, District Judge.

#### I. Introduction

The court issued an order on August 18, 1998 requiring plaintiff to show cause why he should not be sanctioned for providing to the court fraudulent documents, i.e., four memoranda purportedly authored by defendant Bolden. Plaintiff responded on August 26, 1998. The court held a hearing on September 18, 1998 during which testimony of a forensic documents examiner, testimony of the defendant deputy director and the plaintiff, as well as numerous exhibits were presented. For the reasons stated below, the court finds that the four challenged documents, which were attached as exhibits to plaintiff's brief in support of his response to the defendant's motion for summary judgment, are false and that the signatures on them are forged. Therefore, the documents will not be considered for the purposes proffered by plaintiff—evidence of defendant's state of mind and thus relevant to the court's determination of that defendant's motion. In addition, the court is persuaded that the documents were presented by the plaintiff in a manner that constitutes sanctionable conduct under Rule 11 of the Federal Rules of Civil Procedure.[1]

#### II. Standard

■ Attorneys and parties are obligated to present to the court only such "allegations and other factual contentions" as "have evidentiary support." Fed.R.Civ.P. 11(b)(3). Appropriate sanctions are to be "limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated," Fed.R.Civ.P. 11(c)(2) but include nonmonetary directives, a penalty paid to the court, and some or all of the opponent's attorney fees and expenses resulting from the violation. *Id.* In the Sixth Circuit, "[t]he test for the imposition of *Rule 11* sanctions is whether the litigants conduct was reasonable under the circumstances." *U.S. v. $515,060.42 in U.S. Currency,* 152 F.3d 491, 507 (6th Cir.1998) (citation omitted); *See also Union Planters Bank v. L & J Development Co., Inc.,* 115 F.3d 378 (6th Cir.1997). Fraudulent behavior is certainly not reasonable. A party to the litigation who is responsible for such fraudulent behavior is sanctionable under Rule 11. *See Union Planters Bank v. L & J Development Co., Inc.,* 115 F.3d 378 (6th Cir.1997); *See Pope v. Fed. Express Corp.,* 49 F.3d 1327 (8th Cir.1995)(dismissing action and awarding monetary sanctions based on falsified docu-

---

**1.** The court recognizes alternate authority, namely 28 U.S.C. § 1927 or its inherent power, to reach the same end.

ment); *See also White v. General Motors Corp.*, 908 F.2d 675 (10th Cir.1990).

## III.  Discussion

■ More than adequate evidence exists to support Rule 11 sanctions, including: testimony, content of challenged documents, the circumstance of both the plaintiff and the documents, and the physical characteristics of the challenged documents.

### A.  Testimony

The testimony of the court's forensic documents examiner, Leonard Speckin, and of the purported author, Bolden, shows clearly and beyond any doubt that the signatures on these documents are not genuine; such evidence is uncontroverted.

Mr. Speckin testified that the signatures had the shaky and uneven characteristics of being slowly traced.  He further testified that they had a "bad line" and were not flowing; also three of the four were unnaturally identical.  Moreover, he said that the body of the challenged memos appeared to have been produced with a typewriter, unlike the genuine memoranda produced from Mr. Bolden's office.

Mr. Bolden testified not only that the signatures on the challenged documents are not his, but also that the memo form on which the signatures appear is not used by him. He said that such forms were in use during 1994 and 1995 in the prison system for handwritten memoranda among staff.  Mr. Bolden further said that the memoranda he produces are done by a secretary on 8½ × 11 paper using a computer word processor; the challenged memoranda are in a format that is smaller by half, 8½ × 5½. Finally, Mr. Bolden testified that he, as deputy director of a paramilitary organization, would not, and has not, communicated officially with an employee far down the ranks.  The challenged memoranda purport to be addressed from deputy director to inspector (inspector is a rank somewhere below that of warden).  Bolden's communique would be directed to the warden, next in line below the deputy director.

The court concludes that the signatures purporting to be those of "Dan L. Bolden" are forged.

### B.  Content of the Challenged Documents

Beyond the matter of form and signatures, the court finds that, from even a casual review of the content of the documents, one can see that each contains a blatant and conspiratorial effort to punish or somehow "get" the plaintiff.  This is consistent with the theme explained by plaintiff, who testified that defendant Bolden, years earlier, threatened plaintiff in court, saying that plaintiff would receive a "payback" for providing testimony against Bolden's interest in another case.

To summarize the significant parts of the challenged memoranda:

Exhibit 1, the "9/9/94" memo, says "I can smell a lawsuit coming" and instructs the inspector to "stay on top of it."  It notes that "[a]s you know, Bout just received a $30,000 money judgement [sic] levied against the department."  It continues with a purported admission that the prison Dentist "was obviously not in compliance with OP–BHP–42.30 paragraph 5 . . . ."

Exhibit 2, the "11/10/94" memo, instructs the inspector how to "put a stop to further submissions" (i.e., grievances filed by Bout), and notes that "there's no question that a law suit is in the making."

Exhibit 3, the "11/23/94" memo, implies some vile anti-Bout plan, and tells the inspector to "go for it" but to make sure that another prisoner, who has apparently been enlisted as a conspirator "has his story straight and appears credible before contacting the police post."  It concludes with an instruction to "lock down" the conspiring witness "if he backs out of the deal."

Exhibit 4, the "12/2/94" memo, instructs the inspector on how to avoid giving Bout access to the grievance procure: *"DO NOT write a misconduct.  If there's no ticket written then there's no hearing . . . ."* (emphasis in original).

The manner of expression, and especially the detail of the supposed conspiratorial instructions to a subordinate, in each of these

memos display a simplemindedness not present either in the testimony of defendant Bolden or in his authentic writings in evidence. He presented himself in court as an intelligent, educated man of professional and dignified demeanor. The statements in the false memos are the result of someone attempting, without success, to sound educated and authoritative. In addition to the mere tone of the memos, it is incredible that a conspiring prison director would need to instruct a prison inspector on how to avoid a common grievance procedure, or to remind him that Bout had received a "$30,000 money judgement [sic]." It is the product of foolish and wishful imagination that attributes to the deputy director such an admit-it-all statement as "we cannot afford to leave ourselves open, especially where Sandell was wrong." It is even more fanciful to attribute such things as memorialized in a writing. This "confession" from a deputy director to an inspector dives deeply into ludicrous detail, citing purportedly violated prison regulations chapter and verse, all the way down to a specific *paragraph*: "[Sandell] was obviously not in compliance with OP–BHP–42.30 paragraph 5 ...." These supposed admissions from within the official files are baldly incriminating of Bolden and others in the system he helps to manage, but they ring with the false tone of the confession read by a P.O.W. who faces both a camera and a gun.

Finally, that a half-sheet form, obviously designed for handwritten memos, was produced in a typewriter is a fact that cannot easily be explained. Keeping in mind the content of each of the memos—each is, on its face, conspiratorial and illicit—it is simply not thinkable that its author would want anyone else, such as his secretary, to produce such a thing for him and thus be included "in the loop" of illegal knowledge. Thus the author almost certainly would have typed them out himself. Now, one asks, why would he do that; why would he type? The messages are very short. They would have been quick and easy to write out. The only sensible reason to type is legibility; the time and effort it would take for a person to roll each little memo form into a typewriter, aligning the heading and subject reference portions just right before beginning, could be ex-

plained, perhaps, by a need to make the conspiratorial message readable due to the author's illegible handwriting. In this case, however, the genuine signatures of the purported author, Bolden, demonstrate that all-too-rare quality, excellent penmanship.

There is, however, a clear and understandable countervailing reason for a forger to type. Difficult as it is to successfully forge a signature, it would be several orders of magnitude more difficult to successfully forge an entire handwritten memorandum. There are, in sum, no good reasons for Bolden to type and at least three good reasons he would not. All this is entirely separate from evidence of forgery, and all points toward a conclusion that Bolden was not the author.

The court finds that the memoranda are false.

### C. Circumstance of Both the Plaintiff and the Documents.

Finally, the court notes that the forged signature on three of the four documents bears uncanny resemblance to the genuine signature of defendant Bolden on a January 5, 1995, letter to one Marianne Schut of Grand Rapids. Mrs. Schut is the mother of plaintiff Bout. The examiner, Mr. Speckin, opined that the forged signature on three of the four false memos was probably traced from that January 5, 1995, letter (the fourth forgery being "aberrant", perhaps an attempt at freehand duplication). Earlier, before either the opinion of the examiner or even the existence of Bolden's copy of this January 5, 1995, letter was known, it was the plaintiff himself who connected his mother to the making of the copies of these memos. The plaintiff's statement in his affidavit connecting his mother was repeated in the plaintiff's testimony and was borne out by the appearance of one of the exhibits, as follows. Each of the questioned documents, Exhibits 1, 2, 3, and 4, is taped to a backer cut from a large mailing envelope (this point also is made in the plaintiff's affidavit). The backer on Exhibit 1 contains part of a return address and a mailing address. The envelope was addressed to "Harry Bout" and the visible part of the return address shows "... MI 49504." This is the same state and zip code

at which the plaintiff's mother resided in 1995.

If the court were to credit the plaintiff's testimony about being confined to his cell, there would have been many people with a better *opportunity* to fabricate these memoranda [2]. However, the court can think of no person who would have a better *motive* than plaintiff's to create such materials. Nor could the plaintiff credibly suggest anyone in such position when the court asked him that during his testimony.

The plaintiff did, though, offer a response of sorts to the question both in his affidavit and in his testimony. Perhaps, plaintiff thought, defendant Bolden himself, or someone acting on his behalf within the prison system, may have had the motive to create such obviously false but incriminating memoranda, and to have them "knowingly included" into the Freedom of Information Act response. It would have been possible, the plaintiff agreed, for these unknown people to have been acting even earlier, creating the forgeries and inserting them into the prison files in hopes that plaintiff would later seek them under FOIA. Perhaps, the plaintiff thought, Bolden would hope that plaintiff would recognize the incriminating nature of the cooked-up memoranda and submit them to a court in defense of a yet-to-be-filed lawsuit, thus making plaintiff look bad when the court later discovered the falsity of the documents. In his affidavit, he suggested that "such an act was committed with a malicious intent to sabotage my credibility."

Plaintiff's thinking in this regard seems surreal, but it is instructive. It is the same variety of convoluted conspiracy ideation shown in the body of the false memos themselves. Those memos are constructed to present a portrait of an evil prison director with a secret vendetta against a lowly inmate. They seem to explain how Mr. Bout has been singled out to be wrongly and vengefully treated by manipulation of the system from above by a powerful man pulling the stings of subordinates.

## D. Physical Characteristics of the Challenged Documents

Another aspect of the plaintiff's presentation is problematic and at odds with other testimony. Mr. Speckin's testimony included an important observation that has observable physical support. The examiner testified that "Q1, Q3 and Q4 were copied on the same copy machine." He explained that every copy machine, after some use, develops identifiable defects or damage to the glass platen or other parts that will transfer visibly to the end product. Such markings were pointed out in Q1, Q3 and Q4 (memos dated respectively 9–9–94, 11–23–94 and 12–2–94); these markings are readily visible to the court. The visible defects are in identical relative positions on two of the memos (9–9–94 and 11–23–94); the same defects are visible, in the same relative positions, on the third memo (12–2–94) when that memo is turned upside-down.

Thus the only manner in which the copier defect markings could have been deposited on three memos is if they *each* were run through the same copier in the same relative position ... that is, three separate passes through one copier are required to produce the markings.

Of course, there is no way to know when such defect markings were deposited (i.e., during which iteration of a copy that was itself produced from a copy). Therefore, it is theoretically possible that in some earlier copying done within prison files, these defect markings could have been deposited, only to be reproduced when a copy was copied for plaintiff's FOIA response.

The plaintiff's testimony, though, presented a much different picture. He claimed that these memoranda, exactly half the size of standard 8½ × 11 paper, were presented to him copied two-to-a-sheet. He stated in his affidavit and in his testimony that after he received the two sheets, he cut each in half to make four exhibits [3]. This testimony clearly implies that within the prison files the memoranda existed in one of two forms: either in

---

**2.** The defendant was not himself bereft of opportunity: he maintained communication with others outside the prison.

**3.** Four exhibits, he said, would be "more impressive" than two.

their original half-size format, or already copied two-to-a-sheet as the plaintiff received them.

Plaintiff's testimony cannot be reconciled with known facts or common sense. First, there is no good reason for a prison office worker to make a copy of a 5½ × 8½ document, and then go to the trouble of cutting it down with scissors to exactly its original size in order to file it. In fact, merely a desire to control the thickness of office files would militate against such a practice. If the prison files contained only copies of these memoranda, and not the originals, they would almost certainly have been full-sheet copies of the half-sheet originals. Second, there is no clear connection either in date proximity or content among these memoranda that would motivate a prison office worker to preserve them two-to-a-sheet (while presumably discarding the originals) and then to attach one pair of memos to one Bout grievance and the remaining pair of memos to another Bout grievance.[4]

If copies of the memoranda were all that remained in the prison files, and each was preserved on a separate copy sheet, as seems to the court most understandable, then in preparing a FOIA response, the full-sheet copies would have been copied, resulting in four 8½ × 11 copies each containing one memorandum, not the two 8½ × 11 sheets each containing two memoranda, as plaintiff testified.

The only construction that is consistent with the testimony of plaintiff but not inconsistent with the testimony of Speckin and that could also explain the presence of the damage marks is this: first, four false memoranda were typed by someone in the prison system, with Mr. Bolden's signature traced on three of them using as a model Mr. Bolden's genuine signature from his own file copy of his 1995 letter to the plaintiff's mother; next, the four 5½ × 8½ memos were separately copied on full-size sheets of copy paper, three of them in the same relative position on the same copier, the fourth probably on a different copier; then the four 8½ × 11 copies were cut down to their original 5½ × 8½ size, grouped two-by-two, and copied again, after which the original memos and the first set of 5½ × 8½ copies were discarded; finally, the two resulting sheets consisting of two memos each were each recopied and connected to the copy of a single grievance in the file of Mr. Bout and mailed out to Bout's attorney under FOIA.

This series of events, necessary if plaintiff's testimony is to be credited, is utterly senseless. The court does not credit plaintiff's testimony. The court concludes, in fact, that the testimony of the plaintiff in this respect was knowingly false. It was material to the issue at hand: the identity and source of the challenged memoranda.

## IV. Summary and Conclusions

The court finds, in addition to any other findings mentioned in the body of this Order and not repeated here, that:

1) the false content of the challenged memoranda is obvious;

2) plaintiff was in communication with his mother, whose letter from Mr. Bolden provided the genuine signature model on which three of the four forged signatures were based;

3) plaintiff possessed the opportunity, in combination with his mother and others, to cause the false memos to be created at his direction[5];

4) plaintiff was the only person with an understandable motive to fabricate them;

5) plaintiff provided them to his attorneys to be inserted into the court's records;

6) either at plaintiff's direction or with his knowledge the false documents were presented to the court in an effort to

---

4. This is the scenario Mr. Bout envisioned in his affidavit, saying that he had received the copies of the memos attached to copies of two separate grievances.

5. A further (although not weighty) reason in support of the court's conclusions, is that the plaintiff had ample financial means to hire others, in or out of the prison system, to serve his purposes; he apparently had in fact won a $30,000 judgment against the prison system at some time in the recent past.

maintain the litigation and defend it against dismissal;

7) plaintiff is personally responsible for the presence in this court's file of these fraudulent documents;

8) plaintiff's affidavit and testimony about the origin of the false documents are both perjurious;

9) plaintiff has perpetrated a fraud on the court;

10) plaintiff has violated Rule 11 of the Federal Rules of Civil Procedure.

**IT IS ORDERED** that:

1) the portion of plaintiff's response to the defendant's motion for summary judgment and the portion of plaintiff's objections to the Magistrate Judge's Report and Recommendation that address plaintiff's "retaliation" claim are hereby ordered stricken; these matters will not be considered, but shall remain physically within the courts files; and

2) defendants' attorney shall submit to the court forthwith a bill of all fees and expenses incurred either as a result of the plaintiff's submission of the false memoranda or connected with the "retaliation" claim, showing how the fee or expense is connected with that phase of the litigation; and

3) upon review, approval and presentation by the court to plaintiff, plaintiff shall then forthwith pay to the defendants their just fees and expenses incurred as a result of plaintiff's fraudulent acts; and

4) plaintiff shall pay the fees of the expert examiner, Mr. Leonard Speckin; and

5) the court reserves specific judgment on an appropriate additional penalty to be paid to the court by plaintiff; the court will first review both fees and expenses incurred as a result of plaintiff's sanctionable acts and the fees of the expert examiner.